**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SHERRY MULL,                               )
                                           )
                     Plaintiff,            )
                                           )
v.                                         )        2:11-cv-1536
                                           )        Electronic Filing
PNC BANK, NATIONAL ASSOCATION              )
                                           )
                     Defendant.            )

## OPINION

Plaintiff commenced this action seeking redress for allegedly being terminated from employment in violation of the Age Discrimination in Employment Act ("ADEA"). Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there

is a *genuine issue for trial,*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56(a), (e)) (emphasis in *Matsushita*). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." *Harter v. GAF Corp.,* 967 F.2d 846 (3d Cir.1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382–83 n. 12 (3d Cir.1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. *Anderson,* 477 U.S. at 249–50; *see also Big Apple BMW, Inc. v. BMW of North America,* 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied,* 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was hired by PNC as a teller in July 1991, at which time she was 38 years of age. She was promoted to teller supervisor in 1997 and assigned to the PNC branch located at the Lebanon Shops in Pittsburgh. Plaintiff's responsibilities as teller supervisor included

servicing customers, training tellers, auditing teller cash drawers, ensuring compliance with teller cash-handling protocols and answering employee inquiries.

In October 2008, Thomas Tedrow ("Tedrow") became manager at the Lebanon Shops branch. Tedrow was in his early to mid-thirties. Plaintiff reported to Tedrow until her discharge on September 21, 2010.

Corporate policies were enforced inconsistently throughout plaintiff's tenure at PNC. Before Tedrow's arrival defendant's workplace policies and procedures, necessarily balanced against "real world" job demands and the provision of good customer service, were applied according to the dictates of common sense. For example, despite at times having an out-of-balance teller drawer or not meeting investment referral goals, plaintiff was never disciplined under defendant's corrective action policy until Tedrow became branch manager. All of plaintiff's branch managers prior to Tedrow took the position that if PNC suffered no resulting financial loss teller errors were "not a big deal" and tellers were not subjected to corrective action.

Defendant's formal corrective action policy governs the disciplinary process for all PNC employees who have completed the new-hire probationary period successfully. The corrective action policy is progressive. That is, where an employee's deficient performance does not improve, the corrective action process provides for increasingly intensive action to be taken. Step one is a verbal warning or counseling, during which the employee is made aware of the problematic performance, work habit or work-related behavior. The next step is a written warning. Where the problematic performance, work habit or work-related behavior continues, the areas of concern are discussed with the employee, documented and added to the employee's personnel file. If a written warning does not remedy the performance issue, the employee may

be placed on probation for up to 90 days. The stated purpose of probation is to put the employee on notice that failure to correct the performance deficiencies and maintain improvement likely will result in termination. The last step in PNC's corrective action process is a final written warning. For conduct related issues, step three of the corrective action process generally will be a final written warning instead of probation. Depending on the infraction the employee will be advised that if the violation, behavior or conduct occurs again, the employee will be terminated.

Plaintiff received a verbal warning on June 11, 2009 for failing to meet her monthly investment referral quota. PNC requires tellers and teller supervisors to produce a minimum of two qualified investment referrals per month. An investment referral is generated when, in the course of speaking with a customer, the employee determines that the customer has the time, interest and money to speak with a financial advisor regarding investments. Whether or not an investment referral is "qualified," and therefore counts toward satisfying the employee's investment referral quota, is determined by the branch's investment broker.[1]

Over the course of plaintiff's employment (1) many branches failed to meet their respective investment referral goals, (2) the Lebanon Shops branch managers preceding Tedrow enforced the policy governing investment referral quotas loosely or not at all and (3) plaintiff continued to receive "pretty decent" pay raises despite not meeting her quota. The only Lebanon Shops branch employee who consistently met the investment referral quota was Annette Kregiel ("Kregiel"), but there were times when even she failed to do so. Kregiel testified that the "whole branch was having a hard time making the quotas."

At the close of business each day tellers and teller supervisors are required to perform the function of cash balancing – the process of counting, calculating and settling the day's final cash

---

[1] Gary Rectenwald performed this function at the Lebanon Shops branch from January 2010 through September 2010.

figure to ensure that the cash in the teller drawer equals the amount calculated by the bank's computer system. A drawer is in balance if the cash taken in and paid out throughout the business day agrees with the end-of-day computer system totals and paper entries. A drawer may become unbalanced, for example, when one teller buys or sells cash to another to meet the needs of their respective cash drawers and fails to record the cash transfer properly. Such transactions are governed by defendant's buying or selling cash policy, which provides that a teller must record buys and sells in excess of $100.00 at the time of the cash exchange. Failure to record the transfer at that time will result in the teller accepting the overage or shortage at the end of the business day. This situation is referred to as a teller difference and subjects the teller to corrective action under defendant's policies and standards for teller differences regardless of whether the money is or is not ultimately recovered.[2] Tellers are prohibited from "force balancing," the process by which a teller corrects the discrepancy after the fact by suspending his or her balance and processing a new record to bring the drawer into balance.

Similar to the investment referral quota policy, Lebanon Shops branch managers preceding Tedrow enforced the policy governing teller differences loosely or not at all. Plaintiff acknowledged, however, that corrective action may be appropriate under defendant's teller

---

[2] PNC's policies and standards for teller differences provide the following corrective action guidelines. Coaching and counseling sessions are warranted if the teller's net dollar amount of differences greater than $10.00 equal $299.99 or less. Verbal notification and counseling sessions are warranted in either of the following cases: (1) a teller's net dollar amount of differences greater than $10.00 equal $300.00 or more or (2) the number of differences greater than $10.00 reaches or exceeds 30 for full-time employees. A written warning is warranted in either of the following cases: (1) a teller's net dollar amount of differences greater than $10.00 is between $600.00 and $999.99 or (2) the number of differences greater than $10.00 reaches or exceeds 46 for full-time employees. Probation is warranted in either of the following cases: (1) a teller's net dollar amount of differences greater than $10.00 is $1,000.00 or more or (2) the number of differences greater than $10.00 reaches or exceeds 56 for full-time employees. When a teller incurs a single difference of $1,000 or more the teller may be subject to immediate probation or, depending on the particular circumstance, immediate termination.

difference policy where there is a significant teller difference even if it does not result in a loss to the bank.

Plaintiff received written warnings concerning a cluster of events which occurred between January 25, 2010 and January 29, 2010. Corrective action records indicate that on January 25, 2010, Tedrow observed plaintiff put away her cash drawer at the end of the business day. He then announced that a surprise cash audit would occur the following business day. Plaintiff indicated that she had not yet balanced her drawer and was showing an out-of-balance of $3,000.00, which was located within minutes. Although records indicate that plaintiff admitted to not following policy and procedure regarding counting cash in the vault at the time of balancing, plaintiff vehemently denied both violating the policy and admitting to having done so. Plaintiff maintained and continues to contend that the out-of-balance was discovered before she was required to accept the difference under defendant's policy because her cash was not yet "off the floor" and the branch's main vault remained unlocked.

Two days later, the Lebanon Shops branch's ATM was out of balance with an overage of $14,500.00. The ATM custodian, Kregiel, immediately notified plaintiff of the overage. As the "back up control teller" at the Lebanon Shops branch, Kregiel was second in command to plaintiff. Kregiel generally attended to ATM issues, including balancing the ATM.

The ATM frequently was out-of-balance. It was Kregiel's practice to notify plaintiff immediately of any ATM out-of-balance but it was customary to then allow a day or so for the balance to resolve itself. Kregiel testified that these out-of-balances normally did resolve themselves within a day or so and generally were not reported to Tedrow unless resolution did not occur within that timeframe. On January 27, 2010, plaintiff directed Kregiel to notify Tedrow of the out-of-balance, which Kregiel did not do. Plaintiff did not inform Tedrow of the

out-of-balance herself, which apparently was a violation of defendant's policy. Tedrow eventually was informed of the overage by loss prevention on February 1, 2010.

On January 29, 2010, Tedrow sought guidance from PNC's Employment Relations Information Center ("ERIC") regarding plaintiff's alleged failure to meet her investment referral quota. Records indicate that Tedrow discussed referral goals with plaintiff on January 5, 2010, and he provided referral-related coaching to plaintiff on January 8, 2010 and January 22, 2010. Caroline Jones, a senior employee relations consultant, advised Tedrow to remind plaintiff of the recent verbal warning she received and to reissue that warning with a "very specific expectations set." On February 1, 2010, Tedrow issued another verbal warning to plaintiff that if he did not see immediate and sustained improvement then further corrective action could occur up to and including termination.

On February 2, 2010, plaintiff received a final written warning regarding an out-of-balance with a shortage of $10,000.00 occurring on January 29, 2010. On that date, plaintiff sold $10,000.00 in 20 dollar bills to Paig Campbell ("Campbell"). During the transaction plaintiff inadvertently gave Campbell an additional $10,000.00 in cash. By the time plaintiff noticed the error, Campbell had already left the branch and the vault was locked. Plaintiff accepted the out-of-balance and notified loss prevention of the shortage. Suggesting that she engaged in force balancing, Campbell signed off in-balance despite having a $10,000.00 surplus in her drawer. Tedrow was required to return to the branch that night to perform a full cash audit. Plaintiff was required by policy to inform Tedrow of the shortage on the day of the occurrence but did not do so until the following day. Despite the fact that plaintiff accepted the shortage (as was required by policy) and Campbell force balanced (as was prohibited by policy), plaintiff received the same corrective action as Campbell – a final written warning.

Plaintiff again was subject to PNC's corrective action policy on February 11, 2010. Corrective action records reveal that plaintiff was

> "required to show immediate and sustained improvement in all aspects of following PNC and branch policies and procedures. [Plaintiff] is required as the teller supervisor to demonstrate proper cash control, notify the branch manager of any teller differences, and notify the appropriate chain of command of any teller differences on the same day which they occur. As the teller supervisor, [plaintiff] is to set the example in completing these procedures in the proper manner and is to instruct the tellers on the line to adhere to these guidelines. [Plaintiff] is to bring any work issues to her [manager's] attention to review and resolve."

This constituted a final written warning to plaintiff. The warning was to and did remain in plaintiff's employment file for the duration of her employment. The warning advised plaintiff that her failure to show immediate and sustained improvement would result in further corrective action up to and including termination.

On June 30, 2010, Tedrow along with Mary Ann Wallis ("Wallis"), sales and services support manager, delivered another written warning to plaintiff. This warning, which again related to plaintiff's failure to meet her investment referral quota, noted that since plaintiff received a verbal warning in February she had produced only a single investment referral. In sharp contrast, however, plaintiff was issued a certificate of excellence in which she was commended for being "#10 in referral units" for defendant's entire South Region and credited with five referral units in June of 2010. Tedrow initially provided deposition testimony that the referenced referral units did not relate to investment referrals, but conceded that he did not recall independently the number or type of referrals with which plaintiff was credited. Wallis testified that she similarly could not discern the nature of the referrals from the face of the certificate.

On July 1, 2010, Nancy Bentley's ("Bentley") employment with PNC was terminated for failing to meet her investment referral quota. Bentley, who was in her sixties, had been employed by defendant for approximately 20 years and had worked with plaintiff for "quite a

few" of those years. The two were friends. When Bentley was being escorted from the bank, plaintiff became very upset and attempted to follow Bentley out of the bank to say goodbye. Tedrow and Wallis prohibited plaintiff from doing so, ushered her into a conference room and directed her to take the rest of the day off, which she did. Later that evening plaintiff contacted Tedrow and explained in a voicemail message that she was too upset to work the next day. When plaintiff did return to work Tedrow told plaintiff not to "ever talk to [him] like [she] talk[s] to [her] ex-husband again." This comment baffled plaintiff as to its meaning and prompted her to contact ERIC.

Plaintiff spoke with an unknown ERIC representative and complained that Tedrow had assaulted her verbally. According to plaintiff, the representative acted as if the incident was not a major concern but said that she would address the issue. Plaintiff may also have reported during her conversation with the ERIC representative her perception that Tedrow's attitude toward her began to change in January of 2010.

The record reflects that plaintiff received a merit pay increase effective July 24, 2010.

Plaintiff's ultimate termination ostensibly was based on an incident that occurred on September 10, 2010. Defendant asserts that plaintiff failed to deposit in its designated location a blue mesh courier bag containing a portion of the branch's daily transactions. This incident involved plaintiff and Kregiel, who remained at the branch after hours to attempt to resolve a $950.00 out-of-balance in compliance with defendant's policies. Believing that the courier had not yet arrived at the branch to make the pick up, they placed the courier bag in its designated location at some time between 6:45 p.m. and 7:45 p.m. In fact, the courier had already come and gone. Tedrow received notice that the courier pick up was missed. To ensure that the day's transactions were processed according to defendant's policy, Tedrow returned to the branch that

evening to collect the courier bag himself. He delivered it to its processing location without loss to defendant or PNC customers. The out-of-balance situation was resolved during normal business hours the following day. Plaintiff reportedly distributed the incorrect denomination of cash to a customer, who returned the excess cash to the branch. Defendant sustained no financial loss.

Defendant maintains a formal policy regarding the preparation of the blue mesh courier bag. According to the policy, the courier bag "provides a secure way to deliver work processed at the branch to the appropriate back office area. The proof bag and mail bag are placed into the blue mesh bag for daily pick up by the branch courier services. Branches should ensure that work is sent daily with each courier run." If the branch's daily transactions do not reach processing in a timely manner, customers could experience transactional delays. The policy outlines a four-step process for preparation of the end-of-day bags.[3] A provision for missed courier pickups is included in the policy. It directs tellers to call their market mall center for instructions when the blue mesh bag is not picked up by the courier. The policy makes no reference to a courier pick-up schedule or a specific time frame required for the courier bag to be prepared and deposited to its designated location.

Plaintiff was placed on paid administrative leave on September 20, 2010. Plaintiff's employment at PNC was terminated on September 21, 2010. She was 57 years of age.

It is well-settled that claims of discrimination are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in *McDonnell*

---

[3] First, a bank employee ensures that the proof bag and the mail bag are locked before placing them into the blue mesh courier bag. Second, a bank employee completes the branch/courier control sheet with the following information: date, number of blue mesh bags, number of boxes and other. Step three requires the employee who completes the control sheet to sign their first and last name where indicated. Finally, a bank employee must place the branch control sheet and the blue mesh bag in the designated location for pickup by the courier.

*Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993); *Waldron v. SL Industries, Inc.,* 56 F.3d 491, 495 (3d Cir.1995) (*citing Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).  In order to prevail on a claim of intentional age discrimination, a plaintiff must prove that his or her age actually motivated or had a determinative influence in the adverse employment action in question.  *Fasold v. Justice,* 409 F.3d 178, 184 (3d Cir. 2005) (citations omitted).  This burden can be met by presenting either direct evidence of discrimination or indirect evidence that satisfies the three-step process known as the *McDonnell Douglas* paradigm.

Plaintiff seeks to establish a claim of intentional age discrimination resulting in discharge through indirect evidence.  A claim under the ADEA based on indirect evidence is evaluated pursuant to the *McDonnell Douglas* tripartite burden-shifting analysis.  Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–253 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a *prima facie* case of discrimination.  *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir. 1997).  The major purpose of the *prima facie* case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 (3d Cir. 1999) (*citing Burdine,* 450 U.S.

at 253–54 ("[t]he *prima facie* case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")).  A *prima facie* case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors.  *Id.* (quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a *prima facie* case.  *Jones v. School District of Philadelphia,* 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a *prima facie* case depend on the facts of the particular case").  The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination.  *Waldron,* 56 F.3d at 494.  Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.  *Id.; see also Furnco,* 438 U.S. at 577 ("The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.").

If the plaintiff presents a *prima facie* case, the second stage of the *McDonnell Douglas* paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action.  *Keller,* 130 F.3d at 1108.  The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment."  *St. Mary's Honor Center,* 509 U.S. at 509.  If the defendant meets this burden, the presumption of discrimination created by the *prima facie* case "drops" from the case.  *Id.* at 511; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. *Jones,* 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." *St. Mary's Honor Center,* 509 U.S. at 515. This is because while the burden of production under the *McDonnell Douglas* analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones,* 198 F.3d at 410 (quoting *Burdine,* 450 U.S. at 252–53).

Defendant moves for summary judgment on the grounds that plaintiff lacks sufficient evidence to support her claim. First, it asserts that plaintiff fails to establish a *prima facie* case of age discrimination. Specifically, plaintiff cannot show that she was qualified for her job. From defendant's perspective compliance with established policies and procedures is a prerequisite for an individual to be qualified for employment. Plaintiff amassed a series of verbal and written warnings for failing to comply with such policies and procedures and thus did not meet this basic requirement.

Moreover, defendant argues that even if plaintiff made out a *prima facie* case, her claim would still fail because it had legitimate reasons for her termination: plaintiff's violation of the

established policies and procedures governing cash handling and courier pickups and plaintiff's failure to meet her investment referral quota.

Furthermore, defendant posits that there is no evidence to suggest that it administered its corrective action policies in a biased manner or that the use of its policies to terminate plaintiff was a pretext for age discrimination. Plaintiff has not produced any evidence demonstrating that younger, similarly situated employees were not subject to and did not receive the same warnings and punishments as she did. Thus, defendant maintains that summary judgment is appropriate.

Plaintiff maintains that she has made out a *prima facie* case. Specifically, her 19 years of employment with PNC, 14 years of which were as teller supervisor, qualified her for the position in question.

Second, she argues that defendant's proffered reasons for her termination are a pretext for invidious discrimination. Particularly, defendant's proffered reasons are unsubstantiated by the policies plaintiff purportedly violated because (1) the teller difference incidents promptly were resolved without loss to PNC; (2) the courier bag policy was vague with regard to courier pick up times and what to do in the event of a missed pick up; and (3) every branch employee had difficulty meeting their investment referral quotas. In addition, Tedrow enforced defendant's workplace policies and procedures inconsistently and in differential fashion with younger employees receiving more favorable and lenient treatment under his enforcement of these policies. Based on the facts of record, plaintiff asserts that a reasonable finder of fact could disbelieve defendant's articulated reason or believe that discrimination was more likely than not the cause for her termination.

Plaintiff establishes a *prima facie* case of age discrimination. In general, a plaintiff may establish a *prima facie* case by demonstrating that he (1) is a member of a protected class, (2)

was qualified for the position, (3) suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002); *see also Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066 n. 5 (3d Cir.1996) (*en banc*), *cert. denied,* 521 U.S. 1129 (1997) (discussing nature and purpose of *prima facie* case). The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait. *Pivirotto,* 191 F.3d at 352 (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, (1977)). In short, the plaintiff must be able to point to "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *Id.* at 355 (quoting *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312 (1996)).

Plaintiff was a member of the protected class. She was born on January 23, 1949, and was over forty years of age at the time of her termination.

Plaintiff was qualified for her position. In determining whether a plaintiff was qualified for a position, the court must consider whether the plaintiff had the objective experience and education necessary to qualify as a viable candidate for or maintain the position of employment. *Kennedy v. Chubb Group of Ins. Cos.*, 60 F. Supp.2d 384, 391 n.1 (D. N.J. 1999) (citing *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) ("We determine a plaintiff's qualifications for purposes of proving a *prima facie* case by an objective standard.") (internal citations omitted). As previously noted the plaintiff's burden of production at this stage is minimal and is to be viewed as part of a sensible and orderly way of organizing and analyzing the evidence. *Waldron,* 56 F.3d at 494.

Here, plaintiff was employed by defendant as a teller from 1991 until 1996, at which time she was promoted to teller supervisor. Plaintiff maintained her position as teller supervisor until her termination on September 21, 2010. Plaintiff did not receive a single verbal or written warning from 1991 to 2009. Thus, it is clear that plaintiff had the requisite education and experience to maintain her position. Defendant's arguments to the contrary are therefore unavailing.

Plaintiff suffered an adverse employment action. She was terminated on September 21, 2010.

Finally, the attendant circumstances raise an inference of discrimination. Plaintiff presents evidence which if left unexplained indicates that younger employees such as Cavatiao and Campbell were treated more favorably under defendant's workplace policies and procedures.

Turning to the second step of the *McDonnell Douglas* analysis, defendant proffers a legitimate explanation for plaintiff's termination: plaintiff's repeated violation of defendant's policies and procedures. Specifically, defendant asserts that plaintiff was discharged because (1) her negligent cash handling resulted in significant teller differences on a number of occasions; (2) she failed to follow procedures by ensuring customer transactions were processed in a timely manner when she failed to place paperwork out for pickup and processing; and (3) she failed to meet her investment referral quota.

Plaintiff cannot dispute that her employment record reflected a series of verbal and written warnings for violating defendant's teller difference policy and failing to meet her investment referral quota, followed by a violation of the courier bag policy that resulted in termination. Defendant's explanation sufficiently shifts the burden to plaintiff to establish that the record will support a finding of discrimination by pretext or otherwise.

The third step of the analysis is often the most critical. *Fasold,* 409 F.3d at 185 ("Therefore, this case, like many ADEA actions, turns on the final step of the *McDonnell Douglas* framework . . . "). At this juncture the inquiry focuses on whether the plaintiff has presented sufficient evidence to allow a reasonable finder of fact to find by a preponderance of the evidence that the defendant's proffered reasons are a pretext for invidious discrimination. *Id.*

The United States Court of Appeals for the Third Circuit has summarized the plaintiff's burden at summary judgment on this step as follows:

> Specifically, in *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir.1994), and later in *Sheridan* [*v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996) (*en banc* )], we stated that a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer action." *Fuentes,* 32 F.3d at 764; *Sheridan,* 100 F.3d at 1067.

*Jones,* 198 F.3d at 412–13. Under the first approach, the finder of fact's rejection of the defendant's proffered explanation allows, but does not compel, a finding of discrimination and judgment for the plaintiff. *Sheridan,* 100 F.3d at 1061; *Reeves,* 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). In other words, once a defendant's justification has been discredited, a jury is entitled to infer that discrimination is the most likely alternative explanation, particularly because the defendant is in the best position to explain the actual reason for its decision. *Reeves,* 530 U.S. at 147. "Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148; *accord Sheridan,* 100 F.3d at 1061.

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes,* 32 F.3d at 765. Instead, the plaintiff must come forward with evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citations omitted) (emphasis in original). In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence. *Id.* at 764. For example, "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Id.* at 764 n. 7. "That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Id.*

Plaintiff marshals the following in an effort to discredit defendant's explanation and show that the decision to terminate her was based in part on age. First, she argues that her termination, which ostensibly was based on her violation of PNC's policy governing the courier bag, was improper because (1) she adhered to the policy by placing the courier bag in the designated pickup bin no later than 7:45 p.m.; (2) there was no established or posted schedule or time for the

courier to pick up the bag at the branch, either by written policy or custom; and (3) the written policy made specific reference to missed courier pickups and allowed for the possibility that a missed pickup could occur. Plaintiff further argues that because of the open view of the area in which she was working, she reasonably believed that had the courier stopped earlier in the evening, he would have knocked on the door or window of the branch to get her attention and inquire about the bag before departing without it.

Second, plaintiff asserts that she was treated disparately with respect to several incidents in which her teller drawer was out of balance. She posits that corrective action under PNC's teller difference policy regarding the incidents that occurred on January 25, 2010 and September 10, 2010 was inappropriate because the funds involved were recovered in a short amount of time with no loss to defendant. With respect to the January 29, 2010 incident, plaintiff and Campbell, a teller in her twenties, engaged in an erroneously recorded close of business cash transfer such that both of the tellers' drawers were out of balance in the amount of $10,000.00. It later was determined that Campbell engaged in the prohibited practice of force balancing to correct her teller drawer while plaintiff merely accepted her out-of-balance in accordance with policy. Both tellers received final written warnings despite the fact that the difference was promptly resolved and there was no loss to the bank. Plaintiff essentially contends that this incident reveals defendant's discriminatory animus because Campbell's violation of the teller difference policy was egregious while plaintiff's was not, yet both plaintiff and Campbell were subject to the same disciplinary action.

Third, plaintiff argues that the written warning she received on June 30, 2010 for failing to meet her investment referral quota was inappropriate because almost all of the branch's tellers had difficulty meeting this quota. Tedrow repeatedly issued disciplinary warnings to plaintiff

and Bentley, the two most senior employees at the branch, for failing to achieve their investment referral quotas. Bentley's termination ostensibly was based on her inability to meet this quota. Additionally, Cavataio replaced Bentley as a customer service representative despite also failing to meet the investment referral quota.

Lastly, plaintiff asserts that all of the above occurred in a corporate culture permeated with discriminatory animus based on age. Plaintiff perceived Tedrow to be friendlier in his interactions with younger bank employees and to hold them to a lower standard of responsibility than plaintiff. In plaintiff's view, Tedrow's attitude toward her was combative and hostile, while his actions demonstrated a preference for plaintiff's younger coworkers. As one example, plaintiff proffered evidence of Tedrow's treatment of Kathy Cavataio ("Cavataio"), a part-time teller who was approximately 40 years of age. Despite consistently being late to work by ten to 30 minutes and regularly texting on the teller line, Cavataio was never issued a verbal or written warning or otherwise subject to defendant's corrective action policy. Plaintiff often observed Tedrow and Cavataio joking around and sharing photographs with one another.

Plaintiff's proffered evidence in support of establishing pretext is insufficient as a matter of law. It is well-settled that an evaluation of whether the evidence as a whole is sufficient to establish pretext is a fact-based inquiry. *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998)). In undertaking this inquiry "[t]he question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination." *Keller*, 130 F.3d at 1109. A mere showing that the employer's decision was wrong or mistaken is insufficient because the real issue is whether discriminatory animus motivated the employer's decision, not

whether the employer was wise, shrewd, prudent or competent in making the decision. *Fuentes*, 32 F.3d at 765.

Plaintiff's evidence demonstrates little more than defendant did not make a shrewd or insightful decision about whether termination was warranted in light of plaintiff's disciplinary record. In other words, it falls short of a sufficient quantum of probative evidence to permit a finding that defendant's proffered explanation was pretext for age discrimination.

First, at best plaintiff has demonstrated that defendant misinterpreted and/or misapplied the courier bag policy. As plaintiff notes, the policy is devoid of a pick-up schedule or a specific time frame required for the courier bag to be prepared and placed at its designated location. But even if plaintiff reasonably believed that the courier would have attempted to get her attention and inquire about the bag before departing without it, these facts do not provide probative evidence to permit a reasonable finder of fact to find that defendant's proffered reasons are a pretext for invidious discrimination. They show only that defendant's decision was wrong or mistaken, not that the decision was a *post hoc* fabrication and discriminatory animus motivated defendant's decision to terminate plaintiff.

Second, plaintiff's attempt to raise the specter of discriminatory animus by comparing herself with Campbell and Cavataio lacks persuasive force. Neither of the incidents identified by plaintiff is sufficiently comparable to permit the inference that similarly situated employees were treated disparately.

The plaintiff has the burden of demonstrating that similarly situated persons were treated differently. *Simpson*, 142 F.3d at 645 (citing *Burdine,* 450 U.S. at 258). To meet this burden plaintiff would need to show that she and another younger employee received disparate treatment

under defendant's corrective action policy under the same or comparably similar circumstances. She has not done so.

The infractions cited by plaintiff regarding Cavataio include texting while at the counter as a teller and reporting late for work. Plaintiff's infractions included multiple teller differences and failures to meet her investment referral quota. Cavataio's infractions involved employee conduct that did not include shortcomings in the actual performance of essential employee tasks; plaintiff's did. The bases for discipline between plaintiff and Cavataio therefore are not comparable. Thus, beyond the mere fact that both were employees who were disciplined, they were not similarly situated comparators.

Moreover, plaintiff's assertion that Cavataio's promotion to the customer service representative position despite also failing to meet the investment referral quota is further evidence of age discrimination is misplaced. Prior to her promotion Cavataio was a part-time employee. There is no evidence to suggest that Cavataio (1) was subject to the same investment referral quota as plaintiff in light of that status or (2) was not coached or disciplined under defendant's policy for failing to meet her quota.

Similarly inapposite is plaintiff's contention that discriminatory animus is revealed by defendant's failure to impose a greater punishment on Campbell for force balancing. Both plaintiff and Campbell were given final written warnings. As defendant's disciplinary action policy is progressive, the appropriate disciplinary action would depend on Campbell's then existing disciplinary record. Plaintiff has not adduced any evidence to suggest that Campbell's final written warning was inappropriate from this perspective. Nor has plaintiff produced evidence to raise the inference that Campbell should have been terminated but was treated more favorably because of her age.

In short, plaintiff has failed to select comparators who were treated differently under similar circumstances. As such, the probative force of her comparisons in treatment is not probative of discriminatory animus based on age. *Compare Simpson,* 142 F.3d at 645–47 (When utilizing a defendant's comparative treatment of others to raise an inference of discrimination the plaintiff "cannot selectively choose a comparator" who was not similarly situated, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus.).

Plaintiff's evidence of different treatment among other tellers will support a finding that defendant's decision to terminate plaintiff upon review may not have been a sound, fair or wise decision. The decision may have been wrong, unfair, and harsh. However, the record falls short of providing sufficient evidence to support the proposition that the decision "was so implausible, inconsistent, incoherent or contradictory that it must be a pretext for something else." *Kautz*, 412 F.3d at 471 (collecting cases in support).

Third, plaintiff argues that discipline under the investment referrals policy was inappropriate because nearly every teller at the Lebanon Shops branch had difficulty meeting the quota. But plaintiff has not adduced any evidence indicating that other tellers who failed to meet the quota were not similarly disciplined under the policy. Plaintiff was not terminated for failure to meet her investment referral quota. She received intermittent coaching and discipline from Tedrow for her deficient performance in this area. The record is devoid of any evidence that other tellers outside the protected class who also failed to meet the quota were not subject to such discipline. To the contrary, the record merely raises the inference that meeting this requirement was not enforced to a degree that would produce draconian consequences and all employees subject to the quota benefitted from this relaxation. The fact that plaintiff was disciplined under

the policy for failure to meet her investment referral quota is therefore insufficient to raise an inference of discriminatory animus.

Against this backdrop plaintiff's evidence of a corporate culture of ageism adds very little to support a finding of disparate treatment. Tedrow may have had better working relationships with other tellers, but that is not the issue. The issue is whether discriminatory animus motivated defendant's decision to terminate plaintiff.

Plaintiff was the only teller supervisor at the branch and held a position where she was expected to set an example for the tellers in complying with defendant's workplace policies and procedures. The nature of her position foisted her into the limelight when it came to complying with appropriate procedures and assigned responsibilities. Complaining that tellers below her with different disciplinary records who had engaged in different forms of rule infractions were not disciplined as harshly fails to provide probative evidence of age discrimination or a culture of age bias. In other words, whether the incidents are viewed singularly or collectively, it is apparent that plaintiff's proffered evidence is mere quibbling with the wisdom of defendant's decisions concerning the application of its workplace policies and procedures.

For the reasons set forth above, plaintiff's proffered evidence of pretext will not support a finding of age discrimination. Accordingly, defendant's motion for summary judgment will be granted. An appropriate order will follow.

Date: March 25, 2014

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:    Jeffrey T. Morris, Esquire
Deborah I. Ecker, Esquire
Eric P. Reif, Esquire
Gary J. Lieberman, Esquire
Nicholas W. Schieffelin, Esquire

(*Via CM/ECF Electronic Mail*)